**NATIONWIDE LIFE INSURANCE COMPANY, Appellant**

v.

**COMMONWEALTH LAND TITLE INSURANCE COMPANY.**

No. 06–2890.

United States Court of Appeals, Third Circuit.

Argued Jan. 28, 2009.

Opinion Filed: Aug. 31, 2009.

Justin K. Miller, Esquire, C. Paul Scheuritzel, Esquire (Argued), Larsson & Scheuritzel, Philadelphia, PA, for Appellant.

Craig R. Blackman, Esquire, Neal R. Troum, Esquire (Argued), Stradley, Ronon, Stevens & Young, Philadelphia, PA, for Appellee.

Before SCIRICA, Chief Judge,
AMBRO, and SMITH, Circuit Judges.

OPINION OF THE COURT

AMBRO, Circuit Judge.

Nationwide Life Insurance Company ("Nationwide") appeals the District Court's dismissal of its claim under a title insurance policy issued by Commonwealth Land Title Insurance Company ("Commonwealth"). Nationwide seeks payment for a loss arising from land title restrictions that allowed a former owner of Nationwide's real property to prevent its sale by Nationwide. It asserts that the District Court erred in ruling that Commonwealth had "expressly excepted" from insurance coverage any loss related to these restrictions.

To decide this case, we interpret the standard-form policy drafted by the American Land Title Association ("ALTA") and used by Commonwealth. In particular, we determine what a title insurer must do to except restrictions from coverage under a specific endorsement to the policy. The District Court held that an insurer can do so merely by listing in a schedule of exceptions to the policy the document in which the restrictions are found. Because we believe that an insurer must list the actual restriction in such a schedule to except them, we reverse.

## I. Factual and Procedural Background

PMI Associates ("PMI") purchased real property (the "Property") from Liberty Mills Limited Partnership ("Liberty Mills") in 1988. According to the complaint filed by Nationwide, PMI and Liberty Mills entered into a Declaration of Restrictions (the "Declaration"), vesting Liberty Mills with, among other things, the right to refuse approval of future purchasers of the Property.[1] The Declaration also gave Liberty Mills an option to repur-

chase the Property in certain circumstances.[2]

In 2001, PMI borrowed $3.5 million from Nationwide, using the Property as collateral. Nationwide insured its lender's interest in the Property by purchasing a title insurance policy from Commonwealth. The policy contains a specific endorsement, known as an ALTA 9 Endorsement, that, among other things, covers Nationwide against loss from "a right of first refusal or the prior approval of a future purchaser or occupant" unless "expressly excepted" in a schedule of exceptions appended to the policy.

PMI defaulted in 2003 on the balance of its loan from Nationwide. As a result, PMI conveyed the Property to Nationwide by fee simple deed. Nationwide attempted to sell the Property to Ironwood Real Estate, LLC ("Ironwood"). This sale was halted, however, when Liberty Mills's successor in interest, Franklin Mills Associates Limited Partnership ("Franklin Mills"), refused to approve Ironwood as a buyer in accordance with Franklin Mills's rights conferred by the restrictions in the Declaration.[3]

---

1. Commonwealth disputes that the Declaration contains a prior-approval-of-future-purchaser restriction, arguing instead that Nationwide seeks simply to evade the Declaration's use restrictions. Commw.'s Br. at 4–5 n. 2. Commonwealth accepts, however, that because this case was decided at the motion to dismiss stage in the District Court, the allegations in Nationwide's complaint "must be accepted as true for purposes of this appeal." *Id.*

2. In a related case in the District Court, Liberty Mills's successor, Franklin Mills Associates Limited Partnership, alleged as an affirmative defense that this right is one of "first refusal." Answer and Affirmative Defenses to Plaintiff's Complaint, *Nationwide Life Ins. Co. v. Franklin Mills Assocs. Ltd. P'ship*, No. 04–05049, at 5 (E.D. Pa. April 4, 2005). Typically a right of first refusal comes into play where one has the option to buy, or buy back, a property before it can be sold to a proposed

buyer by the property's then-owner. We are unaware of anything in the record indicating that Franklin Mills sought to purchase the Property that Nationwide proposed to sell to another. Indeed, Commonwealth asserts there is no right of first refusal involved in this case. Commw.'s Br. at 4–5 n. 2.

3. Because Franklin Mills based its refusal on the Declaration's restrictions, Commonwealth's calling them another name—use restrictions rather than a prior-approval-of-future-purchaser restriction or some other right of refusal, *see supra* nn. 1 & 2—is irrelevant. Though we need not decide whether use restrictions necessarily are restrictions on the approval of future purchasers of property, they are deemed so here because that is the practical effect of Franklin Mills's actions in this case. (In any event, use restrictions are, like prior-approval-of-future-purchaser restrictions, among the important items of in-

Following Franklin Mills's rejection of Ironwood, Nationwide submitted a claim for coverage to Commonwealth. Nationwide alleged that Franklin Mills's rights of refusal were covered restrictions that made the Property unusable and unsalable. Commonwealth denied Nationwide's claim, stating that its policy expressly excepted coverage for loss resulting from Franklin Mills's invoked rights.

Nationwide responded by filing suit in the United States District Court for the Eastern District of Pennsylvania. It argued that the ALTA 9 Endorsement to its policy covered loss resulting from Franklin Mills's rights of refusal because those rights were not expressly excepted in the policy's schedule of exceptions. Commonwealth answered with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). It asserted that the rights were expressly excepted from coverage provided by the ALTA 9 Endorsement because the Declaration, in which the rights were stated, was listed in the policy's schedule of exceptions.

The District Court granted Commonwealth's motion to dismiss. It held that the general listing of the Declaration under the heading "exceptions from coverage" in the policy's exceptions schedule unambiguously eliminated coverage for loss stemming from the rights of refusal. *See Nationwide Life Ins. Co. v. Commw. Land Title Ins. Co.,* No. 05–281, 2005 WL 2716492, at *7 (E.D.Pa. Oct.19, 2005). In doing so, it rejected Nationwide's claim that only a specific listing of the rights in the exceptions schedule could exempt them from ALTA 9 Endorsement coverage. *See id.*

Nationwide then filed a motion for reconsideration with exhibits, contending that the Court's interpretation of the poli-

formation lenders and owners seek in obtain-

cy and endorsement was inconsistent with industry custom and practice. The Court denied this motion and struck most of Nationwide's exhibits from the record. It reiterated its prior interpretation of the policy, rejected Nationwide's reference to custom and practice, and held that "it was [Nationwide]'s duty to exercise proper diligence before issuing the subject mortgage" on the Property. *Nationwide Life Ins. Co. v. Commw. Land Title Ins. Co.,* No. 05–281, 2006 WL 1192998, at *1–3 (E.D.Pa. May 3, 2006). Nationwide appeals to us.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.

We review *de novo* the District Court's dismissal of an action under Rule 12(b)(6). *See Phillips v. County of Allegheny,* 515 F.3d 224, 230 (3d Cir.2008). "[W]e 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Rodriguez v. Our Lady of Lourdes Med. Ctr.,* 552 F.3d 297, 302–03 (3d Cir.2008) (quoting *Phillips,* 515 F.3d at 233).

Interpretation of an insurance policy is a question of law over which we exercise plenary review. *See Regents of Mercersburg College v. Republic Franklin Ins. Co.,* 458 F.3d 159, 163 (3d Cir.2006). Under Pennsylvania law, which applies to this action, we ascertain the intent of the parties by reading the policy as a whole, and we give unambiguous terms their plain meaning. *See Jacobs Constructors, Inc. v. NPS Energy Servs., Inc.,* 264 F.3d 365,

ing title insurance policies.)

375–76 (3d Cir.2001); *J.C. Penney Life Ins. Co. v. Pilosi,* 393 F.3d 356, 363 (3d Cir.2004). We also consider evidence of industry custom and practice. *Sunbeam Corp. v. Liberty Mut. Ins. Co.,* 566 Pa. 494, 781 A.2d 1189, 1193 (2001) ("[C]ustom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract."). We construe ambiguous terms strictly against the insurer, but avoid reading the policy "to create ambiguities where none exist." *Sikirica v. Nationwide Ins. Co.,* 416 F.3d 214, 220 (3d Cir.2005).

## III. Discussion

Nationwide claims that, under the policy issued by Commonwealth, it (1) is covered for loss arising from the rights of refusal contained in the Declaration, and (2) did not bear the burden of diligence to ensure that its title to the Property was free from harmful rights or restrictions. We agree on both points. The text and purpose of the policy, along with custom and practice in the title insurance industry, convince us that the ALTA 9 Endorsement covers loss stemming from rights of refusal unless those rights are explicitly noted in a schedule of exceptions to the policy. Insurers may not except rights of refusal or other title restrictions[4] from ALTA 9 Endorsement coverage simply by listing as exceptions the instruments in which they are embedded. Instead, the burden is on the title insurer to find and except them expressly.

### A. Excepting a Restriction from ALTA 9 Endorsement Coverage

■ The title insurance policy that Commonwealth issued to Nationwide is a 1992 ALTA Loan Policy with an ALTA 9 Endorsement. Like all such policies, it contains six sections: (1) the Insuring Provisions stating the basic coverage terms; (2) the Exclusions from Coverage, which list standard coverage exclusions; (3) the Conditions and Stipulations that define relevant terms and note the parties' responsibilities; (4) Schedule A, which describes the Property and amount of insurance; (5) Schedule B, which lists, in two parts, coverage exceptions specific to the Property; and (6) the ALTA 9 Endorsement (also referred to hereinafter as "the Endorsement"), which, for an additional price, insures over certain exceptions in Schedule B. *See* Joyce D. Palomar, 1 *Title Insurance Law* §§ 5.17–9.4 (2005); Amy W. Beatie & Arthur R. Kleven, *The Devil in the Details: Water Rights and Title Insurance,* 7 U. Denver Water L.Rev. 381, 398–400 (2004); Charles B. DeWitt, III, *Title Insurance: A Primer,* 3 Tenn. J. Prac. & Proc. 15, 18–19 (2001). We read these sections together, giving effect to all their provisions. *See Western United Life Assur. Co. v. Hayden,* 64 F.3d 833, 837 (3d Cir.1995); Eric Holmes, 4 *Holmes' Appleman on Insurance* § 20.1 (2d ed.1998).

The Insuring Provisions of the policy state:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, COMMONWEALTH LAND TITLE INSURANCE COMPANY, a Pennsylvania corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of

---

**4.** For purposes of our opinion, "restrictions" include defects in title, liens, easements, encumbrances, conditions, and covenants (such as the rights at issue in this case) affecting the insured property.

Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;

2. Any defect in or lien or encumbrance on the title;

3. Unmarketability of the title;

. . .

6. The priority of any lien or encumbrance over the lien of the insured mortgage; . . . .

Together with Schedule A, which identifies the Property and sets a $3.5 million amount of insurance, these provisions obligate Commonwealth to insure Nationwide's interest in the Property against loss from any restriction not stated in the Exclusions from Coverage or listed as an exception in Schedule B.

Schedule B, which is captioned "EXCEPTIONS FROM COVERAGE," lists a number of instruments that affect the Property. Part I of Schedule B sets out matters excepted from coverage that might cause loss to Nationwide. Part II of Schedule B lists matters affecting the Property that are subordinate to Nationwide's interest. The Declaration containing the restrictions giving rise to Nationwide's loss is listed in Part I of Schedule B:

This policy does not insure against loss or damage . . . which arise by reason of:

. . . .

5. Declaration of Restrictions between Liberty Mills Limited Partnership and PMI Associates dated August 15, 1988 and recorded in Deed Book FHS 1155, page 206, and First Amendment to Declaration of Restrictions between Franklin Mills Associates Limited Partnership and

PMI Associates dated December 5, 1989 and recorded December 21, 1989 in Deed Book FHS 1518, page 541. (The "PMI Declaration").

The Declaration is thus "an exception from coverage contained in Schedule B."

The Declaration's listing as an exception, however, does not necessarily exempt from coverage all losses stemming from it. As noted, the ALTA 9 Endorsement brings back into play coverage for restrictions contained in instruments listed in Schedule B unless those restrictions themselves are set out in that Schedule. *See* James L. Gosdin, *Title Insurance: A Comprehensive Overview* 257 (3d ed.2007); Holmes, *supra*, § 20.1.

Paragraph 1(b)(2) of the Endorsement reads:

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1. The existence at Date of Policy of any of the following:

. . . .

(b) *Unless expressly excepted in Schedule B*

. . . .

(2) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which, in addition, (i) establishes an easement on the land; (ii) provides a lien for liquidated damages; (iii) provides for a private charge or assessment; (iv) provides for *an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.*

App. at 39 (emphases added). Accordingly, because the Declaration is an "instru-

ment referred to in Schedule B as containing . . . restrictions on the land which . . . provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant," loss arising from it is covered under paragraph 1(b)(2) of the ALTA 9 Endorsement "[u]nless expressly excepted in Schedule B."

As one might expect, Commonwealth argues that loss arising from the Declaration is "expressly excepted in Schedule B," and therefore is not covered by paragraph 1(b)(2) of the ALTA 9 Endorsement. Nationwide contends otherwise. No provision of the policy or Endorsement, however, explains how to determine whether loss from the Declaration is expressly excepted.

Commonwealth asserts that Schedule B's two-part structure provides the framework that distinguishes the Declaration as "expressly excepted" from ALTA 9 Endorsement coverage. Looking first to what Schedule B excepts from the Insuring Provisions of the policy, Commonwealth alleges that only Part I of Schedule B contains exemptions from policy coverage, whereas Part II of Schedule B "contains not exemptions from coverage (like Part I) but rather the prioritization of liens." Commw.'s Br. at 3. It states that "the respective lead-in language in Parts I and II of Schedule B removes any doubt about this important difference between the two Parts." *Id.* at 10. The caption to Part I, it notes, states:

SCHEDULE B

EXCEPTIONS FROM COVERAGE

PART I

But the caption to Part II reads:

SCHEDULE B

PART II

Commonwealth then highlights that Part I begins, "This policy does not insure against loss or damage . . . which arise by reason of," while Part II reads:

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the Company insures that these matters are subordinate to the lien or charge of the insured mortgage upon the estate or interest.

This "lead-in" language, states Commonwealth, shows that Schedule B, Part I, contains "the stuff of exception," while Schedule B, Part II, simply lists those matters "referred to in Schedule B" as "subordinate to the . . . insured mortgage." *Id.*

Building on this framework, Commonwealth claims that the instruments in Schedule B, Part I, are "expressly excepted" from Endorsement coverage because they are the only "exceptions from coverage" in the policy, whereas the instruments in Schedule B, Part II, fall within the coverage of the Endorsement because they are "referred to in Schedule B" but not "expressly excepted in Schedule B." *See id.* at 9–10. Commonwealth argues that this construction provides a clear way to identify matters covered by the ALTA 9 Endorsement—loss from instruments in Schedule B, Part I, is not covered; loss from instruments in Schedule B, Part II, is covered. And because the Declaration is listed in Schedule B, Part I, Commonwealth concludes that no loss stemming from it is covered by paragraph 1(b)(2) of the Endorsement. *See id.*

Nationwide dismisses Commonwealth's interpretation, and responds that loss resulting from the Declaration is covered by the ALTA 9 Endorsement because the rights of refusal stated within it are not

specifically mentioned in Schedule B. Nationwide argues that *both* parts of Schedule B contain exceptions from coverage and asserts that "to signify an exception to ALTA 9 Endorsement coverage, an insurer [must] expand[ ] the description of the pertinent instrument [i]n Schedule B to describe any included .... rights specified in subparagraph 1(b)(2) ... of the ALTA 9." Nationwide's Br. at 14–15. "In other words," it claims, "exceptions to the coverage afforded by the ALTA 9 are not made merely by listing a *document* on Schedule B, coverage is instead negated by specifically referring to and excepting the *covenant, condition, or right* in question." Nationwide's Supp. Br. at 10; *see also Nationwide,* 2006 WL 1192998, at *2. Nationwide argues that this construction of the policy best serves insurers and lenders, and it emphasizes that it "is the construction widely followed in the title insurance industry." Nationwide's Reply Br. at 1.

The District Court was persuaded by Commonwealth's reasoning, holding that the "heading and language of Schedule B, Part I, clearly indicate that the Declaration is 'expressly excepted in Schedule B.'" *Nationwide,* 2005 WL 2716492, at *7. It opined that "[t]he Policy would be clearer had [Commonwealth] placed the 'Exceptions from Coverage' header under 'Part I' instead of under 'Schedule B,'" but it ruled that "the language preceding Part I makes clear that the items listed in Part I are exceptions from coverage ..., while the language preceding Part II indicates that the items listed in Part II are not exceptions from coverage...." *Id.* (internal citations omitted).

We disagree with Commonwealth and the District Court. In our view, concluding that Schedule B, Part II, does not contain "exceptions from coverage," and reading the caption and initial language of

Schedule B, Part I, to "expressly except" from ALTA 9 Endorsement coverage loss stemming from all matters in instruments listed therein, runs roughshod over the policy's language, purpose, and usage. We instead adopt Nationwide's construction of the policy and hold that paragraph 1(b)(2) of the ALTA 9 Endorsement extends coverage to loss from an instrument in either part of Schedule B unless the insurer takes express exception to the specific restrictions stated in the instrument. This interpretation fits the textual scheme of the policy, and reflects the purpose and industry custom associated with the ALTA 9 Endorsement.

### 1. Text

Contrary to Commonwealth's interpretation, we think the placement of the line "EXCEPTIONS FROM COVERAGE" above "PART I" in the caption of Schedule B is evidence that *both* Parts I and II contain "exceptions from coverage." This interpretation is reinforced by a reading of a blank 1992 ALTA Loan Policy, which shows that the caption's drafting was not an error and indicates that the seeming inapplicability of the line "EXCEPTIONS FROM COVERAGE" to Part II is the result of nothing more than the page break between Parts I and II of Schedule B. *See* Gosdin, *supra,* at 38. It also finds support in an intratextual reading of the policy, which never distinguishes between Parts I and II of Schedule B and instead refers only to "the exceptions from coverage contained in Schedule B."

A textual comparison of the ALTA 9 Endorsement (which covers an ALTA Loan Policy) to its companion ALTA 9.1 Endorsement (which covers an ALTA Owner's Policy) also rejects Commonwealth's suggestion that paragraph 1(b)(2) of the ALTA 9 Endorsement covers only

matters in Schedule B, Part II. An ALTA 9 Endorsement, to repeat, states:

> The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:
>
> 1. The existence at Date of Policy of any of the following:
>
>    . . . .
>
>    (b) Unless expressly excepted in Schedule B
>
>        . . . .
>
>        (2) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which, in addition, . . . provides for an option to purchase, a right of first refusal, or the prior approval of a future purchaser or occupant.

Similarly, an ALTA 9.1 Endorsement reads:

> The Company insures against loss or damage sustained by the insured by reason of:
>
> 1. The existence at Date of Policy of any of the following unless expressly excepted in Schedule B:
>
>    . . . .
>
>    (b) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which, in addition, . . . provides for an option to purchase, a right of first refusal, or the prior approval of a future purchaser or occupant. . . .

Given the essentially identical language of the two endorsements, one would expect the interpretation of "unless expressly excepted in Schedule B" to remain constant. In particular, if Commonwealth's suggestion is correct, the ALTA Owner's Policy should list express exceptions in Part I of Schedule B and non-exceptions covered by the ALTA 9.1 Endorsement in Part II of Schedule B.

But that is not the case. Rather, the ALTA Owner's Policy does not contain a two-part Schedule B.[5] In the context of language identical to that in an ALTA 9 Endorsement, an insurer drafting an ALTA Owner's Policy thus must do more than simply list an instrument in a part of Schedule B to except all loss related to it from coverage under an ALTA 9.1 Endorsement. It must distinguish between those Schedule B matters that are merely "exceptions from coverage," to which the ALTA 9.1 Endorsement applies, and those that are "expressly excepted" from all coverage. This recognition correlates with interpreting the ALTA 9 Endorsement to cover loss from an instrument in either part of Schedule B unless the insurer explicitly notes the rights or restrictions contained in the instrument.

Requiring insurers to take express exception in Schedule B to rights of refusal or other restrictions mentioned in paragraph 1(b)(2) of the ALTA 9 Endorsement, moreover, does not "torture[ ] the language of the Policy." *Nationwide,* 2005 WL 2716492, at *7. The Endorsement recognizes a difference between "excepted" instruments and "expressly excepted" restrictions.[6] The very term "expressly ex-

---

5. Schedule B of a blank ALTA Owner's Policy reads:

   SCHEDULE B
   EXCEPTIONS FROM COVERAGE
   This policy does not insure against loss . . . which arise[s] by reason of:

6. Paragraph 1(b)(4) of the ALTA 9 Endorsement, for instance, insures against
   loss or damage sustained by reason of. . . .
   (b) Unless *expressly excepted* in Schedule B. . . .
   (4) Any encroachment of existing improvements located on the land . . . sub-

cepted" implies as well that an insurer seeking to retract Endorsement coverage of a restriction must do so specifically.

## 2. Purpose

Commonwealth's constrained interpretation of the ALTA 9 Endorsement also flouts the purpose of the Endorsement. Lenders seeking to insure their mortgage interest in a property pay an additional premium for an ALTA 9 Endorsement to cover, among other things, "any instrument referred to in Schedule B as containing covenants, conditions or restrictions." *See* Beatie & Kleven, *supra*, at 400. We cannot conceive why, as Commonwealth suggests, lenders would do so only to cover instruments in Schedule B, Part II, which already are insured as "subordinate to the lien or charge of the insured mortgage upon the estate or interest." More specifically, it surpasses strange to think that Nationwide would pay for an ALTA 9 En-

dorsement just to cover the matters already listed as subordinate to its interest in Schedule B, Part II, especially where, as here, Nationwide is directly involved in each of those matters[7] and needed no extra assurance that they were harmless to its interest.[8]

Additionally, Commonwealth's interpretation would thwart the purpose of the ALTA 9 Endorsement by eliminating the notice benefits it provides. Through its requirement that insurers "expressly except[ ]" the restrictions they do not want to cover under paragraph 1(b)(2), the Endorsement gives lenders crucial notice of the specific matters that may harm their mortgage interests.[9] By permitting insurers to except expressly all loss from an instrument simply by listing that instrument in Schedule B, Part I, Commonwealth's interpretation would strip away this notice benefit from the ALTA 9 Endorsement.

---

ject to any easement *excepted* in Schedule B.
App. at 39 (emphases added). Under this paragraph, an insurer seeking not to have the Endorsement cover an encroachment on land "subject to any easement excepted in Schedule B" must take specific exception to the encroachment in order to distinguish it from the already excepted easement under which it could cause a loss.

7. The following matters are listed in Schedule B, Part II, of Nationwide's policy:

[1] Unrecorded Lease between PMI Associates ... and Phar–Mor, Inc., dated February 2, 1989 and subordinated by a Subordination, Non–Disturbance and Attornment Agreement between Nationwide Life Insurance Co., and Phar–Mor, Inc. dated February 28, 2001 ... [;]
[2] Assignment of Leases, Rents and Profits between PMI Associates ... and Nationwide Life Insurance Company ... dated March 22, 2001 ... [; and]
[3] UCC–1 financing statements from PMI Associates ... to Nationwide Life Insurance Company recorded ... on April 2, 2001.

App. at 37.

8. This recognition undercuts Commonwealth's suggestion that Nationwide purchased the ALTA 9 Endorsement to provide "an affirmative grant of insurance coverage to the extent that harm results from any matter listed on Part II of Schedule B ... [containing] an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant which impair[s] the mortgage lender's mortgage interest...." Commw.'s Br. at 17 (internal quotations omitted). As a party to each matter listed in Schedule B, Part II, Nationwide had no reason to fear that one of them might contain a restriction that would cause it loss or damage.

9. The importance of notice is shown by this case. Nationwide asserts it did not know until 2003 that the Declaration contained the restrictions on which Franklin Mills refused approval of the proposed future purchaser of the Property. *See* Tr. Or. Arg. at 9–10. It "relied on the policy," which it purchased "in part ... so the title insurer w[ould] go through [the documents relevant to its interest in the Property] and point out potential traps." *Id.*

### 3. Custom and Practice

The title insurance industry's treatment of the ALTA 9 Endorsement strongly supports our reading of the Endorsement. It is one of the "most common" endorsements used to "insure against the effect or aspects of exceptions," Gosdin, *supra,* at 257, and the "standard endorsement for commercial lending transactions." App. at 60; *see also* Palomar, *supra* § 9.3. Industry custom and practice show that *both* parts of Schedule B contain exceptions over which the ALTA 9 Endorsement insures. No guideline or article produced by a title insurer, including Commonwealth,[10] states that only Schedule B, Part I, contains exceptions from coverage or that the ALTA 9 Endorsement covers only matters in Schedule B, Part II.[11]

Indeed, contrary to Commonwealth's claim that Part II of Schedule B does not contain "exceptions from coverage," we note that, in an internal memorandum reviewed by the District Court, LandAmerica Financial Group, Inc. ("LandAmerica"), the parent company of Commonwealth at the time it drafted Nationwide's policy,[12]

10. At oral argument, Commonwealth's counsel suggested that he was "not aware of any explicit guidelines" produced by Commonwealth pertaining to the ALTA 9 Endorsement. Tr. Or. Arg. at 16–17. But a guideline document quoted in Commonwealth's supplemental brief includes an "Underwriting Checklist for Lender's ALTA 9" produced by a branch operation of Commonwealth. Commw.'s Supp. Br. at 3–4 (quoting Commonwealth Land Title Insurance Co., D.C. and Maryland Operations, *98–07 Commonwealth Offers ALTA 9 Coverage on Residential Mortgage Policies,* 3 (June 22, 1998)). This document draws no distinction between the two parts of Schedule B, and notes that "the ALTA 9 protects the lender against loss due to any [covenants, conditions, or restrictions] violation, encroachment, charge, assessment, option, easement, etc., not expressly excepted to in Schedule B." *Id.* at 1–2.

11. In supplemental briefing, Commonwealth quoted from an article written by the Knight–Barry Title Group to show "that only instruments listed in Schedule B, Part II, can trigger coverage from Paragraph 1(b)(2)" of the ALTA 9 Endorsement. Commw.'s Supp. Br. at 3. The article describes the relationship of an ALTA 9 Endorsement to a "Knight–Barry commitment":

Paragraph 1(b)(2) ... [i]nsures that any instrument in Schedule B–II of a Knight–Barry commitment[,] which includes [covenants, conditions, or restrictions,] does not in addition ... provide for an option to purchase, a right of first refusal, or the prior approval of a future purchaser or occupant.... If one of these additional items exists, then we will call out the additional item(s) as an exception on Schedule B–II of the commitment—many times prompting the parties to take further action. For example, if there is a right-of-first refusal in an [instrument], Knight–Barry will include the right-of-first refusal as an exception on Schedule B–II....

Commw.'s Supp. Br. at 3 (quoting Cheri Hipenbecker and Craig Haskins, *The ALTA 9 Endorsement for Loan Policies,* Knight–Barry Title Group (2009)). Although this article seemingly links paragraph 1(b)(2) of the ALTA 9 Endorsement to "Schedule B–II," it is ultimately unhelpful to Commonwealth. A close reading of the article reveals that Schedule B–II of a Knight–Barry commitment is different from Schedule B, Part II, of the 1992 ALTA Loan Policy used as the model for Nationwide's policy. In particular, Schedule B–II of the Knight–Barry commitment appears to serve the function of both parts of the ALTA Schedule B by including all exceptions to the commitment. *See id.* Even Commonwealth does not suggest that Schedule B, Part II, of the ALTA Loan Policy is so broad. *See* Tr. Or. Arg. at 25. More importantly, the article undermines Commonwealth's claim that a listing of an instrument is sufficient to "expressly except[ ]" matters within it from coverage under paragraph 1(b)(2) of the ALTA 9 Endorsement, noting instead that the insurer must "call out" the specific matters.

12. At oral argument, Commonwealth's counsel stated that he did not "know the simple answer" to whether LandAmerica owned Commonwealth. Tr. Or. Arg. at 17. On April 2, 2001, the date Commonwealth issued Nationwide's policy, LandAmerica owned Com-

unambiguously describes the matters in Part II of Schedule B as "exceptions":

> SCHEDULE B–PART II: Enter all *exceptions* to title discovered in the title search and from the survey, if any, that are subordinate to the lien of the insured mortgage.... Schedule B–Part II sets out only those matters affecting the title to the insured land that are subordinate in priority to the lien of the insured mortgage. You must take *exception* to *all* such defects in title, liens, encumbrances and outstanding interests affecting the title.... The items found in Schedule B–Part II are generally lien interests and sometimes leasehold interests.... Probably more often than not, you will have no *exceptions* for Schedule B–Part II. If you have no *exceptions*, insert the word "NONE" in the schedule to show that no *exception* has been taken.

App. at 55–56 (emphases added).

Industry custom and practice also confirm that the ALTA 9 Endorsement covers loss from matters in instruments mentioned in paragraph 1(b)(2) of the Endorsement unless the insurer explicitly notes those matters in Schedule B. For example, LandAmerica provides the following guidance to agents issuing ALTA 9 Endorsements:

> Instruments identified in Exceptions in Schedule B [may] also contain any of the following matters which are NOT shown as separate Schedule B exceptions:
>
> (1) Easements
>
> (2) Liens for liquidated damages
>
> (3) Charges or liens for assessments
>
> (4) Options to purchase, rights of first refusal, or rights of prior approval of purchasers.
>
> *If instruments described in Schedule B Exceptions do contain any of those elements, they should be shown as separate exceptions, or stated as separate components of an exception. For example, if a subdivision "declaration of ... restrictions" also contains grants or reservations of easements, or rights of first refusal, the Schedule B exception should appear as follows:*
>
> METHOD 1 (Multiple exceptions):
>
> > "Declaration of ... Restrictions for __ dated __ recorded at book__page__"
> >
> > "Easements reserved in Declaration of ... Restrictions for __ dated__recorded at book__page__"
> >
> > *"Rights of first refusal reserved in Declaration of ... Restrictions for* __ *dated* __ *recorded at book__page__"*
>
> METHOD 2 (Single exception describing several elements):
>
> > "Declaration of ... Restrictions for __ dated __ recorded at book__, page__; *also, easements and right of first refusal reserved in said declaration."*

LandAmerica, https://www.agentxtra.net/Extranet/singlesource/NavMaster.asp?IndexID=3202&IndexTerm=PUD&LinkID=5178317 (last visited Aug. 28, 2009) (emphases added).[13] This guidance docu-

---

monwealth. *See* App. at 30 (describing Commonwealth as "a LandAmerica Company"). Today it does not. *See* LandAmerica, http://www.landam.com/index.htm (last visited Aug. 28, 2009) (noting that LandAmerica sold

Commonwealth to Fidelity National Financial, Inc. on December 22, 2008).

**13.** This guidance document is published at a website cited by both parties. *See* Nationwide's Supp. Br. at 4 (citing LandAmerica,

ment states precisely that the insurer must take separate and specific exception to the matters contained in instruments listed in Schedule B in order to avoid covering them under the ALTA 9 Endorsement.

Even Commonwealth appears to follow the interpretive approach we now endorse. In an internal bulletin produced by its "D.C. and Maryland Agency Operations," Commonwealth explains that it is "OK" for its agents to use an ALTA 9 Endorsement if a document with restrictions "contains an easement, a lien provision, charge or . . . option/right of first refusal/future purchase approval . . . [b]ut when taking exception to [the document with restrictions], [the agent] must expressly include [the] relevant provision, *e.g.*, 'Terms and provisions of a Declaration, *including access easement created therein dated ___.'*" Commw.'s Supp. Br. at 3–4 (quoting Commonwealth, *98–07 Commonwealth Offers ALTA 9 Coverage on Residential Mortgagee Policies,* 3–4 (June 22, 1998), https://www.agentxtra.net/extranet/SingleSource/content/StateLaw/DistrictofColumbia/Bulletins/DC_98–07_CommonwealthOffers ALTA9Coverage.htm) (emphasis added).[14] The advice in this bulletin dovetails with the guidance document produced by LandAmerica and contrasts with what Commonwealth now argues. It also appears to be the advice that Commonwealth followed in taking exception to a License Agree-

ment in Schedule B, Part I, of Nationwide's policy:

> 6. The appurtenant easement rights insured under the License Agreement dated March 4, 1991 between Franklin Mills Associates Limited Partnership f/k/a Liberty Mills Partnership and PMI Associates . . ., as located on survey . . . Dated March 16, 2001[,] . . . are subject to the following:
>
> a. Terms and conditions of said Agreement
>
> b. Questions of marketability due to the Agreement being unrecorded; and
>
> c. All mortgages, easements, covenants, conditions and restrictions affecting the property now or formerly of Franklin Mills Associates Limited Partnership, adjacent to the insured premises and the subject of said Agreement.

App. at 35–36. Though not stated in the exact manner suggested by the LandAmerica guidance document or Commonwealth bulletin, this listing follows the industry practice of expressly excepting the rights within an instrument (in this listing, the "appurtenant easement rights") so as to remove them from coverage under paragraph 1(b)(2) of the ALTA 9 Endorsement.

In fact, industry practice is so settled in favor of requiring insurers to state the

---

https://www.agentxtra.net/extranet, as a source containing "at least some published underwriting guidelines" relevant to the ALTA 9 Endorsement); Commw.'s Supp. Br. at 3–5. The District Court also admitted and considered information from this website. *See* App. at 54 (denying Commonwealth's motion to strike "all factual allegations regarding . . . [LandAmerica]'s website")

**14.** Although Commonwealth quoted this bulletin in its supplemental brief and did not object to our review of.it in full, *see* Tr. Or.

Arg. at 40, it emphasized that "this is not a Commonwealth Land Title Insurance Company document." *Id.* It is apparent, however, that the D.C. and Maryland Agency Operations are branch offices of Commonwealth, *see* Commonwealth, http://www.cltic.com (last visited Aug. 28, 2009), and Pennsylvania title insurers follow the same drafting custom described in the quoted bulletin. *See* William C. Hart, *The Law of Titles in Pennsylvania,* 1104 (4th ed.2005), *available at* http://www.titlelaw annotated.com/021703.pdf.

specific matters they are excepting from ALTA 9 Endorsement coverage that one industry expert directly criticized the District Court's decision in Commonwealth's favor. Writing in a work published by the American Bar Association's Section of Real Property, Probate and Trust Law, James L. Gosdin detailed the Court's reasoning and concluded:

> The result of this case is surprising and is inconsistent with the widespread interpretation of the Endorsement in the title insurance industry—that the Schedule B exception must refer at least to the "right of first refusal" or "easement" or other such right, although there is no need to refer to the specific paragraph or location in the document of the right.

Gosdin, *supra,* at 258.

\* \* \* \* \*

In sum, the text, purpose, and industry usage of the ALTA 9 Endorsement convince us that the District Court erred in granting Commonwealth's motion to dismiss. To except expressly from ALTA 9 Endorsement coverage a right of refusal or other restrictions noted in paragraph 1(b)(2) of the Endorsement, an insurer must list those restrictions specifically in Schedule B. It is not enough for the insurer merely to list in some part of Schedule B the document in which the restrictions are embedded. Commonwealth thus failed to "expressly except[ ]" from ALTA 9 Endorsement coverage loss from the restrictions contained in the Declaration, and should cover Nationwide's claim.

### B. Assigning the Burden of Diligence To Discover Restrictions

■ In addition to holding that loss from the rights of refusal contained in the Declaration was "expressly excepted" from ALTA 9 Endorsement coverage, the District Court also determined that Na-

tionwide "bore the burden of completing proper diligence" to ensure that the Declaration did not contain restrictions harmful to its interest in the Property. *Nationwide,* 2006 WL 1192998, at \*3. The Court based this determination on its reading of a passage in a LandAmerica article cited by Nationwide that describes paragraph 1(b)(2) of the ALTA 9 Endorsement:

> Paragraph 1(b)(2) insures the lender that a document, described only as containing restrictions, doesn't contain a grant of easement, a lien for liquidated damages, a private charge or assessment, an option, a right of first refusal or a right for prior approval of a future purchaser or occupant.... Paragraph 1(b)(2) is found under paragraph 1(b) because an exception that fully describes the features of a document kills the coverage. The Insured will not be misled by an exception that discloses the features of a recorded instrument. If the exception has incomplete disclosure, the lender must review all of the recorded documents for an opinion that none contains a provision that might harm it.

*Id.* at \*2 (quoting Robert S. Bozarth, *LandAmerica SingleSource: Commercial Transactions 101* (May 2003), https://www.agentxtra.net/extranet/SingleSource/NavMaster.asp?IndexID=3770&IndexTerm=Zoning&LinkID=5187463). The Court particularly focused on the last sentence of this passage to support its ruling. *See id.* at \*2–3.

Nationwide asserts that the Court misread the passage and ruled "in conflict with years of industry practice." *See* Nationwide's Br. at 16 n. 8. Nationwide is correct. The quoted passage makes clear that (1) an insurer must "fully describe the features of a document" to except loss arising from them, and (2) a full description of any excepted "feature" ensures that

**318**

"[t]he Insured will not be misled." In this context, it is unlikely that the passage further means to state, as the District Court ruled, that an insurer's failure to note a matter contained in a document in Schedule B forces "the lender [to] review all of the recorded documents for an opinion that none contains a provision that might harm it." *Nationwide*, 2006 WL 1192998, at *2. Instead, we read the passage's remarks about "incomplete disclosure" as distinguishing between the two methods of taking express exception to matters outlined in the LandAmerica guidance document quoted above. To repeat, the first method lists both an excepted document and every matter within it as a separate exception:

METHOD 1 (Multiple exceptions):

"Declaration of ... Restrictions for ___ dated ___ recorded at book___page___"

"Easements reserved in Declaration of ... Restrictions for ___ dated ___ recorded at book___page___"

"Rights of first refusal reserved in Declaration of ... Restrictions for ___ dated ___ recorded at book___page___"

LandAmerica, https://www.agentxtra.net/Extranet/singlesource/NavMaster.asp?IndexID=3202&IndexTerm=PUD&LinkID=5178317 (last visited Aug. 28, 2009). This method completely discloses to the insured lender the nature of each expressly excepted matter, the party benefitting from its terms, the date it was recorded, and its location in a deed book.

Alternatively, the second method lists the excepted document in detail but only mentions in general the expressly excepted matters within the document:

METHOD 2 (Single exception describing several elements):

"Declaration of ... Restrictions for—— dated —— recorded at book___, page___; also, easements and right of first refusal reserved in said declaration."

*Id.* This method still marks the matters within a document as expressly excepted from coverage, but it does not disclose to the insured lender (1) the party benefitting from each expressly excepted matter, (2) the date on which each matter was recorded, or (3) the location of the matters in a deed book. Thus, when an insurer uses this method to take express exception to a matter within a document, the insured lender must research that matter further to determine its details. In our view, this is what the passage from the LandAmerica article quoted by the District Court means when it states that "[i]f the exception has incomplete disclosure, the lender must review all of the recorded documents for an opinion that none contains a provision that might harm it." *Nationwide*, 2006 WL 1192998, at *2.

The history and purpose of land title insurance further repudiate the District Court's conclusion "that it was [Nationwide]'s duty to exercise proper diligence before issuing the subject mortgage." *Id.* at *3. Since the first land title insurance company opened in 1876,[15] "[o]ne of the big talking points for title insurance is that it relieves the investor from title work, examinations and worry therefrom, as well as affording protection." Gosdin, *supra*, at

---

**15.** The first title insurer was the Real Estate Title Insurance Company of Philadelphia. *See* DeWitt, *supra*, at 17. This company was the forerunner of Commonwealth and sprang up in response to the Pennsylvania Supreme Court's decision in *Watson v. Muirhead*, 57 Pa. 161 (1868), which held that a conveyancer who failed to disclose a defect in a property's title was not liable for losses arising from the defect sustained by the buyer of the property. *See id.*

1 (internal quotations omitted). Title insurers also advertise their ability to review titles accurately and efficiently through use of their title records, which "are more effectively organized than public records, ... may also contain more complete title information, [and may] provide a more efficient means of evaluating title than ... a search through public records." Beatie & Kleven, *supra*, at 400–01. The District Court's contention that a lender or buyer paying for title insurance "b[ears] the burden of completing proper diligence" accordingly robs title insurance of one of its primary reasons to exist.

Nationwide paid Commonwealth to review its interest in the title to the Property and either cover any title restrictions or explicitly identify them as exceptions. In so doing, Nationwide discharged its "burden of completing proper diligence" to the extent that Commonwealth did not expressly except such restrictions from coverage in Schedule B of the policy.

## IV. Conclusion

When Commonwealth issued its title insurance policy to Nationwide, it failed to except expressly the restrictions contained in the Declaration from coverage under paragraph 1(b)(2) of the policy's ALTA 9 Endorsement. To avoid paying for this failure (and Nationwide's claim), Commonwealth seeks to lead us down a path that would make title insurance a Barmecide feast. That is not the purpose of title insurance, it is not how the title insurance industry perceives what it does, and it is not how the text of and guidelines for title insurance read. We thus hold that Commonwealth bore the burden of detecting the restrictions stated in the Declaration, and had to list those restrictions explicitly as exceptions to avoid covering loss from them. For these reasons, we reverse the District Court's order granting Common-

wealth's motion to dismiss and remand for further proceedings consistent with this opinion.